NAPOLEON NORMAN et ux., et al. *vs.* BOLING C. BURNETT.

No form of words is necessary to create a trust; but where it is the intention of parties to create one, it is the duty of the court to declare and enforce it.

The consideration of the trust was a good one, and the undertaking of B. to execute and carry it into effect, was founded on a valuable consideration.

The agreement entered into by B. in 1830, in equity, constitutes him a trustee for a valuable consideration, bound to carry out the object of the trust; and as the period for the termination of the trust has not yet arrived, a court of equity should enforce it.

The agreement made in September, 1848, did not release B. from his trust.

ON appeal from the northern district chancery court at Fulton; Hon. Henry Dickinson, vice-chancellor.

*The appellants filed their bill in the vice-chancery court at* Fulton, on the 31st day of October, 1848, against Boling C. Burnett.

· The bill charges, that one Boling Clarke, of Dinwiddie county, and State of Virginia, on the 16th day of February, 1809, made his last will and testament, and afterwards, during the same year, departed this life; that the said will was duly admitted to probate; that the said will contained a bequest to Mary Burnett, granddaughter to testator, and grandmother to the wives of complainants, Norman and Manahan. This bequest was of certain negro slaves mentioned in said will to her for life, and upon her death to his granddaughter, Mary Burnett, and her heirs forever. That Boling C. Burnett, and Richard Burnett, the father of Mrs. Norman and Manahan, were two of the children of Mary Burnett; that said Richard Burnett died in the year 1826, in the county of Lawrence, and State of Alabama, leaving these two complainants, his only children, then very young.

That at the September term, 1826, of the orphans' court of Lawrence county, Boling C. Burnett administered upon the estate of his deceased brother, Richard; that in 1830 he settled his administration, and was appointed by the court guardian of

Norman et al. *v.* Burnett.

said minors; that their estate was small, which induced their grandmother, Mary Burnett, who desired their better maintenance and education than their estate would admit, to hire to Boling C. Burnett two negro slaves, and descendents of some of the aforesaid slaves, bequeathed to her for life by said will for the year 1831, and to continue from year to year until her death and the division of said slaves; that in consideration of this hiring, the said Boling C. Burnett was to board, clothe, and educate these two children until the division took place.

Boling C. Burnett's answer admits the charges as stated above, and insists, that he, in an ample manner, supported, clothed, and educated these girls; that after they grew up, they married off, and left his house; and that Mary Burnett, by obligation in writing, dated the first day of September, 1848, and before the filing of this bill, fully released him from said agreement of 11th November, 1830.

*Goodwin* and *Sale*, for appellants.

The covenant between Mary Burnett and defendant, is an express creation of a trust in the latter, (coupled with an interest in the trustee,) in the entire life estate of Mary Burnett in the negroes, Jim and Ursey, for the benefit of complainants, her grandchildren.

The acceptance of the trust by the trustee, is admitted in his answer.

The assent of the beneficiaries is presumed, especially as they were minors until their marriage; but even if not presumed, it was legally manifested by filing this bill, claiming the trust. 3 Yerg. 265; 3 Humph. 442; 1 Meigs's Digest, 228, § 8.

The trust being accepted by the trustee, and being coupled with an interest of value to him, furnishes of itself sufficient consideration to enable the beneficiaries to enforce it as against him, even while it remained executory.

And the beneficiaries being the grandchildren of the author of the trust, constitutes a "meritorious" consideration as to her, which the courts will enforce; except only as against her creditors. Lewin on Trusts, 116.

The right to enforce it pertains to the beneficiaries. 2 Story, Eq. (1846 edit.) §§ 1044, 1045 ; 2 Yerg. 57 ; 1 Meigs's Digest, 228, § 8, *supra.* And if by parol a purely legal claim is created in their favor, assumpsit by them will lie. 10 Mass. 289 ; 1 Wheat. Sel. 53, 54, note 1 ; 17 Mass. 400 ; *Hall* v. *Marston,* Ib. 575.

The trust was a continuing one, extending through the life of the author, — "until a division takes place," — and the trustee having entered upon and continued many years in the execution of it, the rights of the beneficiaries became vested, and cannot be impaired by the voluntary act of the author and the trustee, as was attempted by the release of September, 1848, procured since the commencement of this suit. 2 Story, Eq. §§ 1036 *b,* 1046 ; *Shepherd* v. *McEvers,* 4 Johns. Ch. R. 136. And this even where the trust is voluntary, that is, without any consideration, if it have been executed, and does not remain wholly executory. Lewin on Trusts, 110, 111, 112, 113, 114, 115.

But be this as it may, the release, if ever so potent otherwise, is in this instance void and inoperative, being wholly without consideration.

The character of the transaction of 11th November, 1830, taking into view the subsequent execution of it by defendant, is that of a consummated gift of the equitable interest in the negroes for the life of the donor, by deed and delivery both ; and can no more be recalled without the consent of the donees, than a consummated gift of the legal interest.

The measure of the recovery against defendant must of course be regulated by the express terms of his own obligation, namely, " to board, clothe, and send to school," the complainants, "for the hire of the above named negroes." The recovery must, therefore, be the value of what he undertook for valuable consideration to perform. He himself undertook to judge of the adequacy of the consideration which he received. Had that consideration been exorbitant, that is, had the hire of the negroes been annually worth far more than the value of the maintenance and education of complainants, he could still have retained it as against them, and confine himself to the perform-

ance of his stipulated duty under the covenant. He is not the less bound to perform that duty, even if the consideration be not fully adequate.

The prayer for a decree for execution *toties quoties* for the amount of future annual instalments, asks the appropriate remedy for these arrears. *Levert et al.* v. *Redwood*, 9 Port. 79.

No act of limitation can avail defendant.

1st. Because complainant, Eliza, was married before she became of age, and has since continued covert; and Matilda became twenty-one years of age on 21st January, 1846, and even three years had not elapsed before the bill was filed.

2d. The bar of limitation is not pleaded. Defendant simply says, " he relies on the statute of limitation." He must plead it first, then rely on it. Nor does he say what act of limitation. Too uncertain.

Finally. Whatever might have been the vice-chancellor's opinion as to the extent and amount of the recovery to which complainants would be entitled under the circumstances, we cannot appreciate any grounds upon which he dismissed the bill in the face of the uncontroverted fact, that defendant claimed and was allowed, on settlement of his guardianship in Alabama, March 23, 1836, a credit of $57.50 against each of his wards, for boarding and tuition in the year 1835. If the decree is right, what does the agreement of November, 1830, mean ?

*R. Davis*, for appellee.

Mary Burnett never contemplated any thing more than to make provision for her two granddaughters during their minority. Did Boling C. Burnett ever contemplate any thing else ? He agreed to board, clothe, and educate them. Was he bound to board them anywhere else than at his own house? And had he not the right to dictate the quality of cloth that they should wear? If they saw proper to abandon his house, and his table, and refuse the cloth that he might dictate and direct, how can they complain now ? And when they abandoned voluntarily the provisions made for them by this arrangement between Mary Burnett and Boling C. Burnett, did not

the negroes revert to her, Mary Burnett? It was a special fund, set apart for a specific purpose, and evidently looked to a termination, and when the end came, until which the property had ,been' dedicated, the dedication terminated and ceased to be operative, and Mary Burnett had the right to resume the control and management of the property. But then, by the terms of this contract, she never parted with the property, so as to put it entirely beyond her control. There was no consideration for the conveyance, that made it unlimited, and put it beyond her control. She could ·at any time, without the consent of the usees, have reclaimed it, and especially she could do so when the usees had, by their act, placed themselves in a situation not to enjoy the dedication, particularly with the consent of Boling C. Burnett. He ˙did consent, and before this bill was filed, the arrangement of 1830, was abandoned by Mary Burnett and Boling C. Burnett, and this they had the clear right to do.

The counsel for complainants abandon, in their brief, the claim for the services for the girls about the house of Burnett as they grew up. This renders it unnecessary to notice the testimony upon that point.

Mr. Justice YERGER delivered the opinion of the court.

Boling Clarke, in the year 1809, resident in the State of Virginia, bequeathed to his daughter, Mary Burnett, certain slaves, " during her natural life, and at her decease to the heirs of her body and their heirs forever."

Mary Burnett had a son named Richard, who died in the State of Alabama, leaving two children, Eliza and Matilda, both of them infants of tender years, at his decease.

In the year 1830, Mary Burnett, by an agreement in writing, hired two of said slaves to her son, Boling C. Burnett, for the year 1831, " and to continue in the same way until a division takes place ; " and Boling C. Burnett agreed, in consideration of the hire of said slaves, " to board, clothe, and send to school, the two children/ the heirs of Richard Burnett, deceased, so long as the said slaves may be undivided." This agreement is under seal, and was executed on the 11th of November, 1830,

and under it the two slaves were delivered to the defendant, who, qualified as guardian of the children, took them into his family, and boarded, clothed, and schooled them, until the date of their respective marriages, which occurred in the years 1842 and 1844. Since then, they have not resided with the defendant, nor has he boarded or clothed them, or paid an equivalent therefor, although he has retained possession of the slaves. The complainants insist, that by his agreement he is bound to board and clothe them until the slaves may be divided, pursuant to the will of Boling Clarke. The defendant contends, that his obligation ceased on the respective marriages of Eliza and Matilda; and at any rate, if it did not then terminate, it was ended on the 1st of September, 1848, when Mary Burnett released him from the contract made with her in November, 1830.

What are the respective rights and obligations of the complainants and defendant under that agreement?

Mary Burnett, one of the parties to that agreement, was the grandmother of Eliza and Matilda, whose father had died, leaving them infants of tender age. Her object in making the agreement is obvious. It was to provide for the education and the maintenance of these grandchildren. How long did she intend that this provision should continue, and to what extent did the defendant undertake in reference to it. The agreement settles these questions, and fixes the period of its continuance "till a division of the slaves should take place." They were hired to defendant for the year 1831, and "were to continue in the same way until a division takes place;" and by the agreement the defendant, in consideration of the hire of the slaves, was bound to clothe, board, and educate the children, "so long as the slaves may be undivided." The division here referred to was a division of the slaves, which was to take place among the children of Mary Burnett after her death, according to the will of Boling Clarke.

No form of words is necessary to create a trust; but, looking to the acts and intentions of the parties, if it appear that it was their intention to create one, it is the duty of the court to declare and enforce it. In the present case, if we look to the

situation of the parties, we cannot doubt that Mary Burnett, the grandmother, intended to make some provision for the maintenance and education of the infant children of her deceased son; nor can we doubt, that it was her object that this provision should continue until they would become entitled to their father's share of the property, under the will of Boling Clarke. The consideration of this trust was a good one, and the undertaking of the defendant to execute it and carry it into effect was founded on a valuable consideration, the possession and use of the slaves. A fair construction of the agreement between defendant and his mother, made in November, 1830, in equity constitutes him a trustee for a valuable consideration, bound to carry out the objects of the maker of the trust, and, as the period when the trust was to terminate has not yet arrived, we think a court of equity should enforce it. The complainants, Eliza and Matilda, the objects of the trust and the beneficiaries under it, are still in existence. The portion of the trust requiring them to be "schooled" has ceased, but their necessity of maintenance and clothing still continues, and we think the defendant is bound to provide for it.

We do not think the agreement made in September, 1848, between defendant and his mother, Mary Burnett, released him from this trust. The trust to educate and maintain the children having been created by her upon a good, although a voluntary, consideration, vested rights in the beneficiaries, which she, as the maker of the trust, had no power to abrogate or impair, by any act or dealing with the trustee. 2 Story, Eq. § 1036–1046; 4 Johns. Ch. R. 136; Lewin on Trusts, 110, *et seq.*

The boarding and clothing which the defendant is bound to furnish these parties should be proportioned to the value of the hire of slaves, and this maintenance must continue until the division of the property referred to in the agreement made in November, 1830, takes place.

The decree of the vice-chancellor must be reversed, and the cause remanded for further proceedings.